12-1202
SRN/JJG

UNITED STATES DISTRICT COURT     DISTRICT OF MINNESOTA

**RECEIVED**
BY MAIL
MAY 16 2012

CLERK, U.S. DISTRICT COURT
ST. PAUL, MN

Dr. Paul Maas Risenhoover, and for A.R.Y.L.L.R.,     )
                                                     )
                                                     )
                                              Plaintiff(s)     )

vs.                                                  ) CASE NO._____

Hilary Clinton,Tim Kuykendall, Linda Stinnett,         )
Sue McKenzie, Jana Ford Esq.,                          )
Washington County Community Services,                  )
Kari Ann Lindstrom, Patricia Kinzer,                   )
Theresa Wilson, Jenna Pennfield,                       )
Gregory Brooker, Secretary Rice,                       )
the American Institute Taiwan                          )
John and Jane Doe(s), Ying Liang,                      )
and Dr. Pengfei Zhang,                                 )
with Nancy and Terry Risenhoover,          )
Kathleen Sebelius, President Barack Hussein Obama II )

                                              Defendant(s)   )

          Civil jury de medietate linguae demanded (Respublica v
Mesca,US v Cartacho, Article III alienage, fifth, sixth and seventh amendments
and fourteenth amendment due process and equal protection for Indians)

**On petition in civil complaint for violation of constitutional civil rights
contrary to 42 USC 1981 et seq. (1983 suit in equity, 1986 neglect
especially as to Todd Jagodzinski and Minnesota, 1996B federal duty of
nonracist interethnic parenting in fact, 1996 and RFRA Yeshiva Bnai
Noah Formosa claims, see Cleveland County District Court No.
CV-2001-39, Noahide ministerial credentials for Dr. Risenhoover) through
acts constituting tortious constructive false arrest, torture, battery,
malicious prosecution and abuse of process and first amendment
petition rights. Concomitant declaratory relief is sought as** Petitioner asks
this Court to determine that protest against felonious racist child abuse
including a broken arm and persistent mental abuse and cruelty on the basis of
Indian child status and race and national origin, constitute "lawful excuse" for
purposes of refusing child support payments, and that Petitioner was with
lawful excuse for nonpayment to Ying Liang during the course of felonious


SCANNED

racist child abuse of A.R.Y.L.L.R. by Dr. Pengfei ZHANG (who apparently uses the pseudonym Paul).

Petitioner alleges that the co-tortfeasors maliciously abused process **IN THE DISTRICT COURT IN AND FOR CLEVELAND COUNTY, OKLAHOMA, No. CF-2006-174 (Criminal Felony), by knowingly filing an insufficient affidavit to allege the elements for the crime alleged of criminal felony nonsupport. The US (HHS, DOS, AIT, USMG Formosa) and Oklahoma actors were acting as surrogate alter egos for Minnesota throughout the entire course of conduct resulting in the false arrests, detentions, torture, exclusion from the US (Formosa) and malicious prosecutions, see** Feb 17 2006 4:28:19:467PM, http://www.oscn.net/applications/oscn/GetCaseInformation.asp?submitted=true&viewtype=caseGeneral&casemasterID=348723&db=Cleveland, SO: ON ST MTN, CHARGES DISMISSED W/O PREJUDICE. ARREST WARRANT RECALLED (RR)

📄*Document Available (#1002442361)*).

**Even if dismissed, the action appears in the official public records online (OSCN dockets) and create the defamatory effect of falsely accusing use of a pseudonym (Robert) and of commission of the said crime without lawful excuse.**

**A timeline may be useful to clarify the facts and the roles of each co-tortfeasor in the course of their joint conduct.**

**During his high school years, Dr. Risenhoover's father was incarcerated on a felony plea without a jury trial, to fraud for organizing investors to participate in the federal land lottery programs of the BLM. The plea was permitted by the Court even though Terry Risenhoover was non compos mentis, and the plea thus involuntary, and non compos as his brother Jerry, a psychiatric social worker disabled since age 19 or so on the same basis, and even though the word "lottery" in the statutes clearly means the same thing the term means in common usage, namely a risky game of entertainment for which one's investment may not be rewarded. During his father's incarceration, Dr. Risenhoover's mother attempted suicide, being non compos mentis, at the Norman campus.**

**In 1988-1989 Dr. Risenhoover frugally studied in China at Guangzhou during the Tiananmen Square protests and led student demonstrators from the Guangzhou Institute of Foreign Languages in a 15km march to the provincial headquarters next to the Sun Yatsen Memorial Park.**

**In June 1989, Dr. Risenhoover was arrested for posting poems of protest**

on walls around campus, and scheduled for deportation to Hong Kong. In 1989-1990 Dr. Risenhoover was retained pursuant to a secret confidential contract with the United States, see IIPA, 50 USC.

In the fall of 1989 Dr. Risenhoover met Ying Liang at Norman, Oklahoma. In late fall Ying apprised Dr. Risenhoover she would commit suicide if he would not accede to her demand to marry, because she had a secret she needed to share with another, but could only share it if married. Under duress through the threat of vicarious punishment vitiating voluntariness, Dr. Risenhoover acceded to the demand. After their common law marital cohabitation began, they quickly obtained a marriage license recognizing these facts.

In summer 1989 they traveled to Beijing, and resided in the compound at Shuangyushu Nanlierqu, where Ying's paternal aunts, daughters of Dr. Yonglu Liang, of Tainan, Japanese Formosa, resided. In that home Dr. Risenhoover had unfettered access to thousands of classified and internal reference only Chinese communist documents regarding Taiwan. The couple cared for Shuping AN, Ying's maternal grandmother, a stroke victim, at the time, until Ying's temporary leave from the US pending adjustment of status expired. Dr. Risenhoover remained to care for Shuping AN until school began.

In 1990 Dr. Risenhoover requested the United States to specially permit Shuping AN to come to the US to reside with the couple. The US acceded to this request and arranged for irregular vise facilities without a personal interview.

Shuping AN arrived in Oklahoma with extensive bruising from falls or abuse or neglect, in late 1990, while Ying was then several months pregnant.

A.R.Y.L.L.R. was born at Oklahoma City in a birthing clinic home in spring 1991, after Yuping SHI, Ying's mother, arrived from Quebec. Yuping SHI escorted her mother Shuping AN, against the couple's preference, to Quebec.

Weeks later the in-laws at Universite Laval were visited with the newborn in the customary Formosan tradition sometime after thirty days postpartum. Shuping AN was in deteriorating status, and the in-laws asked Dr. Risenhoover to escort her to Beijing for hospitalization. Dr. Risenhoover prevailed on Chairman Mao Zedong (Tsetung)'s former ophthalmologist, Dr. Youzhi Tang, to arrange care. An ambulance met them at the airport on arrival from Canada. After two weeks, Dr.

Risenhoover returned to San Francisco before his eldest brother's August 3 wedding. After wedding while at Disneyland, the couple called Beijing and learned that Shuping AN had passed away a day earlier from pervasive heat exhaustion. The couple did not think the actual proximate cause of death was simply a natural cause, but euthanasia, and were very upset.

In 1994 Ying obtained a decree of divorce from the Cleveland County District Court, providing she would have no actual duty of support for the child throughout minority payable to the custodial parent Dr. Risenhoover. Ying did not ever make any support payments. The $15,000 home down payment the in-laws provided was returned to them by Dr. Risenhoover's paternal grandmother, a Choctaw Indian whose mother was on the Dawes Roll (see there, Berthie, and "Doc", Sullinger). Dr. Risenhoover did not know that Ying was a Formosan Indian (though knowing the Chinese regarded her as Taiwanese) nor that he was Choctaw, and the decree did not comply with the ICWA provisions in Title 25, US Code, for protection of Indian children and parents. Ying did not visit the minor child after the decree, nor provide any support.

In the summer of 1996 Ying by telephone expressed regret in a call to Hong Kong and asked to be able to care for Aaron for the summer, and Dr. Risenhoover acceded to the request. Upon return to Oklahoma, Dr. Risenhoover reclaimed exercise of physical custody over Aaron. In November 1996, while in a graduate course in Intercultural Communications, one block away, the 700 Chautauqua home was gutted by fire and smoke damage resulting from candles lit in the grandparental bedroom by Terry Risenhoover. Terry alleged that the minor child must have somehow adjusted the location of the candles resulting in the bed catching fire. No one adequately explained why the minor child was in the bedroom, or why candles were lit in the first place, as it was early nightfall.

The minor child was diagnosed with autism, and the family were relocated with Red Cross assistance to a hotel, and then with family assistance from the paternal grandmother, a Choctaw Indian, moved to a rental home in Norman. In December 1996, Dr. Risenhoover planned to move to Arizona, after a planned move to Colorado was deemed importune (the lawyer there while married to a Chinese, was though the son of a US Court of Military Appeals justice and brother of a US DEA agent, nevertheless subject to certain professional judgment

impediments). In order to prevent Dr. Risenhoover and the minor child from enjoying their court ordered sole custody consortium bonds, Terry and Nancy Risenhoover and Ying Liang conspired contrary to law to kidnap the minor child by causing Dr. Risenhoover to spend the evening at the paternal grandmother's home. The next morning when Dr. Risenhoover returned, the minor child and all his belongings were missing from the home, and the home was completely locked and inaccessible. Dr. Risenhoover immediately sped to the paternal grandmother's home, where his paternal aunt, Saundra Gourley, arrived, and both grandmother and aunt prevailed on him not to complete the phone calls to the Police or FBI to report the grandparental child kidnapping. They unplugged the phones during attempts to make the reports, and after long persuasion, overpowered Dr. Risenhoover's independent will, coercing acquiescence to non-reporting. Months passed before Dr. Risenhoover was permitted brief telephonic communications with the minor child and apprised of his whereabouts in Kingfisher. When the minor child was returned to Norman in the summer to the paternal grandparents, Dr. Risenhoover reasserted actual physical custody. On hearing for emergency permission to bring the child out of state, for which the original decree required court orders, the Court permitted Ying to bring the child to Wisconsin, pending final hearing on the merits the efficacy of which were mooted by the temporary order permitting removal ad interim. The Court knew the child had autism (Jul 23 1997 DEF'S EXHIBIT "A" COMMUNICATION ADVISE FOR CARERS OF CHILDREN W/AUTISM). The kidnapping was not addressed in the proceedings. The grandparents did not attend. Before the temporary hearing counsel for Ying Liang had ex parte communications of substance about the proceedings in chambers with the Judge. After the hearing (Aug 12 1997 12:00:00:000AM, SO:...(CT REP:DEBBIE)MOT.FOR STAY & NEW HRG OR RE- CONSIDERATION OF *AC*... SO: MOTION FOR STAY & NEW HEARING OR RECONSIDERATION OF MODIFICA-TION OF DECREE IS O.R. (1)WITNESS SWORN FOR DEF ALTHO OTHERS WERE PRESENT WHO WERE NOT CALLED. ALL PREVIOUS ORDERS IN FORCE. *AC*), during which Dr. Risenhoover was non compos throughout, as the Court reporter transcripts and the record show, counsel for Ying Liang had drafted a stipulated agreed order. Dr. Risenhoover refused to agree to the order. Counsel for Ying Liang appears to have nevertheless told the Court that Dr. Risenhoover agreed, and obtained the signature of the

Court on the order. Thereafter it appears counsel for Ying Liang did feloniously alter and utter on the Court's order the words (Defendant refused signature), and then Counsel filed the signed Judicial order, altered after the late Judge's signature, with the Clerk. [viz Jul 25 1997 12:00:00:000AM AGREED ORDER TO MODIFY CUSTODY *AC*] It was then common practice that the Court permitted counsel to hand carry orders for filing with the Clerk to save judicial staff resources, obtain urgent certified copies, etc. The ink and handwriting of the alteration on the forged order is clearly inconsistent with the Court's. No child support computational guidelines were calculated, nor were any guidelines forms attached to the order, nor appear anywhere in the docket, or record, because the Court on the urging of counsel for Ying Liang, merely ratified an arbitrary $500 monthly support payment, with no basis in fact or law, out of thin air, knowing Dr. Risenhoover to have been non compos throughout the proceedings. Ying Liang never requested any cash support for the minor child, only occasionally asking for any other support such as eyeglasses which were much cheaper on Formosa than in the contiguous continental US mainland. [

06-02-2003 CTFREE      -  6289909      Jun 2 2003 3:25:15:100PM -  $ 0.00
          SO:DUE TO DEATH OF ASSIGNED JUDGE, THE
          UNDERSIGNED ACCEPTS ASSIGNMENT FOR THE LIMITED
          PURPOSE OF HEARING THIS CONTEMPT ARRAIGNMENT
          SET FOR 5/20/03 AT 8 AM. NO PARTY OR COUNSEL
          APPEARS AND THEREFORE CONTEMPT CITATION IS
          ORDERED DISMISSED FOR FAILURE TO PROSECUTE.
          *WCH*

]

At some point in 2001 or so Ying Liang became unemployed in Minnesota and obtained a brief, temporary unemployment benefit of some kind. Ying never conveyed this change of facts to Dr. Risenhoover, and never asked for any assistance or support of any kind. Both Ying's parents were employed as research scientists with the University of Wisconsin Madison, and saved approximately sixty percent of their gross annual income through extremely frugal living habits contrary to customary American lifestyle practices. The minor child was never subjected to even a remote possibility of being destitute or necessitous. During the process of obtaining that limited benefit, Ying unknowingly acquiesced through the myriad of documentation, to permitting

Washington County Child Services to act as her attorney to compel support she never sought or expected, the same support she had adamantly refused throughout the minority of the child upon entry of the original decree when she completely abandoned the child to Dr. Risenhoover. Washington County, sua sponte, required the State of Minnesota, acting through the US Department of Health and Human Services acting through the US Department of State acting through the American Institute on Taiwan on Formosa, to deny passport services providing additional pages to Dr. Risenhoover's passport (8 USC 1401(b)). Lack of additional pages frustrated attempts to regularize status issues with the US military government Formosa by Dr. Risenhoover, who in late 2003 was then serving as Special Adviser for International Law to the Permanent Mission of Tuvalu to the United Nations resident on Formosa. In November 2003 Roger Tsungmin Hsieh, National Policy Adviser to Shuibian Chen, US Military Governor Formosa, mandated Dr. Risenhoover to engage Tuvaluan interlocutors for a confederation project, for which Roger pledged the full faith and credit of the Taiwan authorities (the US Military Government subordinate allied occupation) to compensate in like manner to other such efforts, such as the Papua New Guinea diplomatic relations effort where consulting fees of US$30 million were deposited in Singapore by the Taiwan authorities. After Dr. Risenhoover demanded payment of US$2 million in consulting fees, the Taiwan authorities began to opine that he had overstayed, even though their course of conduct long admitted he enjoyed inviolability under the Convention on Privileges and Immunities of the UN and the UN Charter. In late 2005 Dr. Risenhoover sought injunctive relief barring the Taiwan authorities from attempting rendition, exclusion, or deportation or detention, and the Taiwan authorities apprised the Court they had no such plans, so the Court held there was no emergent need for the injunctive relief and dismissed the matter as moot on the reply pleadings. Weeks later on December 15, 2005 when Dr. Risenhoover and his wife Pei-hsuan Chen, then four months pregnant, were moving to Tainan, the Taipei County foreign affairs police entered their inviolable premises without permission and without knocking, through an open door. Dr. Risenhoover presented the Ambassador Enele Sopoaga signed appointment as Special Adviser invoking the Convention and UN Charter privileges. The officers illegally detained Dr. Risenhoover in handcuffs and transported him to the nearby Banqiao Police Station basement

dungeon jail. The American Institute in Taiwan on Formosa dispatched two officers, John Doe and Jane Doe, to the jail, where they assumed control and custody, issuing directives to the Taiwan authorities policemen. The Does threatened to remove Dr. Risenhoover to the foreigners prison if he did not permit them to cancel the US passport, complete a Privacy Act waiver, and obtain a new limited use passport under 22 CFR 51.1. The Taiwan authorities policemen told Pei-hsuan Chen that Dr. Risenhoover was being extradited to the US. They advised her to give birth in the US to make sure the child was a US citizen, since the Taiwan authorities did not recognize the couple's marriage as registered thereon. If the Taiwan authorities recognized the validity of the marriage, or applied Oklahoma common law, based on Dr. Risenhoover's birth in Oklahoma and UOCAVA voting for elections in Oklahoma while on Formosa, as the Civil Law choice of law provisions permit on Formosa, then they could have regularized any alleged irregularities in status, conveying Dr. Risenhoover to resident spousal status during passport validity.

After Dr. Risenhoover and Pei-hsuan Chen flew to the US and Oklahoma, his eldest brother required the family to disconnect the telephones, leaving them in the remote countryside in a home with no phones, and unable to contact Pei-hsuan's folks on Formosa. This was intolerable, and Pei-hsuan demanded to return to Formosa for the planned traditional wedding banquets planned for the last day of Chanukah, a traditional auspicious day for such events. Dr. Risenhoover flew to Washington DC on funds provided for by wire transfer from Roger Tsungmin Hsieh, who was formerly twice convicted of terror or sedition charges for promoting Taiwanese independence. Roger Hsieh knew that the Taiwan authorities (the US military government, see Duarte v Dade), had secretly blacklisted Dr. Risenhoover from re-entry to the island through orders of the Ministry of Foreign Affairs (a term now deleted from the USCIS Guam CNMI VWP rules) Bureau of Consular Affairs for two years and Treaty Law Division for ten years.

At Washington DC, Dr. Risenhoover was permitted use of Ambassador Hersey Kyota of Palau's office and computer. The US through her "Fish and Wildlife Service" agents, with their proclivity for fishing and hunting, especially across the street from the White House, and in the same office complex as the KMT-PFP representative Jason Yuan and the notorious convicted lobbyist Jack Abrahamoff, visited Dr. Risenhoover in the

Embassy to ascertain how he was permitted to use their facilities. Rhinehart Silas formerly the DCM of the Embassy, had met Dr. Risenhoover, with Minute Taupo, and Roger Hsieh, at Taipei, to discuss the international law of confederation in relation to UN admission and the UAR example as well as Taiwan Tuvalu ties and Tuvalu US Friendship treaty duties. Rhinehart had been denied entry to the US to work for the World Bank because of an ancient assault conviction, and required a waiver therefor, while his wife was pregnant with their son. So he was quite sympathetic to the remarkable serendipitous similarity of circumstances affecting Dr. Risenhoover at the time. Thanks to Nenghsiang Wang, CPA, the TECO Deputy Director Dr. Joanne Chang, appreciative for Dr. Risenhoover providing Joint Chiefs of Staff Order 1651 on the Sovereignty Status of Formosa, arranged for her non-consular unofficial consular officers to issue a visa after the US Department of State issued a passport February 21, 2006, after the Cleveland County District Court dismissed an information on February 17, 2006, as an agent for Minnesota and on the motion of Minnesota as movant in the Oklahoma court. The docket oddly shows the February 17 dismissal order filed before an amended information filed the same day changing the name from Robert to Paul, and the amended information was only docketed on February 21, perhaps as a result of the lateness of the day and the federal holiday and weekend. So it is unclear if the amended information was dismissed, though it appears to be so. A warrant was outstanding, though it had been recalled. After TECO issued the visa, Dr. Risenhoover the next morning immediately flew on American Airlines to Kaohsiung via Tokyo via Chicago via Reagan National. At Kaohsiung, Dr. Risenhoover was first admitted for sixty days, then detained and admission cancelled pursuant to the secret blacklisting orders of the US military government. The Kaohsiung airport detention officers tortured Dr. Risenhoover under color of the authority of Minnesota, Oklahoma, and the US military government, pursuant to their joint conspiracy. From Tokyo, Dr. Risenhoover, having sought refugee assistance from Megumi Ban, later applied for refugee rights as spouse of a Formosan (Japanese) Indian and father of a Formosan (Japanese) Indian. The Ministry of Justice approved an extension of stay on the basis of that application, recognizing Dr. Risenhoover as a refugee. While in Palau, Dr. Risenhoover also enjoyed recognition as a refugee from American Formosa. In Tokyo, Dr. Risenhoover spoke with

John Doe, of AIT, Taipei, and Mr. Doe expressed appreciation for the heads up that Dr. Risenhoover was then in Japan proper. Contrary to law and treaty duties of the US and 18 USC 2384, Mr. Doe averred the US recognized the sovereignty of the Taiwan authorities for the purposes of such exclusionary matters. At all times, the Minnesota authorities, and the US (HHS, DOS, AIT, (American Formosa) Taiwan) and Oklahoma for them, have been acting, all under color of territorial or state authority, as if attorneys for Ying Liang, under compulsion from Dr. "Paul" Pengfei ZHANG, who criminally feloniously abused the minor child. In relation to Indians the US acts in a territorial manner, exercising for Congress, our military government (see US ex rel Standing Bear v Crooker, Rubi v Mindoro, Carino v Insular, and Duarte v Dade), such that such acts are under territorial authority for purposes of 42 USC 1981 et seq. (1983, 1985(1) as special adviser, (2) as litigant, (3) as islander on Formosa) jurisdiction.

The initial docket affidavit of Linda Stinnett in no way avers she undertook any factual inquiry or investigation to determine whether lawful excuse did not exist for nonpayment. The Ford information, was filed under the wrong name, intentionally, because the co-tortfeasors wanted to pretend that Petitioner was permitted to obtain a passport to return to the island of Formosa renounced by Japan in the Treaty of Peace, only upon his arrival at Kaohsiung Airport to be subject to detention, arrest, confinement without habeas access to the Court, and torture and battery, the detention staff threatening to handcuff and drag Petitioner back and forth on the airport floor if he refused to fly to Tokyo, Japan. The Court appears on the Court docket to have dismissed the information on motion of the State of Minnesota on February 17, 2006, after their receipt of payment by Don and Merrilee Hardy, retired missionaries, then in Harrah, OK, now perhaps in Alburqueque, New Mexico. The Hardy's made the US$15,000 payment to Minnesota in payment to Ying Liang, solely so as to protect A.R.Y.L.L.R. from further continuing felonious racist child abuse and physical battery and harm by Dr. Pengfei ZHANG in the household of and knowledge and acquiescence thereto by Ying Liang, the biological and legal mother of A.R.Y.L.L.R. (herself deemed, by the Chinese authorities recognized by our One China policy, to be a Taiwanese, ie Formosan ( de jure Japanese), whose paternal aunt studied in Japan proper in Japanese as a Japanese Formosan, see Judicial Yuan order on the de jure Japanese nationality of

Formosans, 1946).

The Court docketed the information under a pseudonym, a per se abuse of process and evidence of the malicious prosecution. The State can produce no document averring Petitioner ever used the name Robert. If the information had been docketed under Paul, the Department of State computer searches during the passport process would have been affected, and the co-tortfeasors desired not to immediately affect that process, until they had extorted the funds from the Hardy's and cashed the checks. Then, knowing that the United States military government Formosa had issued two blacklisting orders excluding Petitioner, they nevertheless placed a neurodifferent American in destitute circumstances outside the continental United States (federal courts have similarly relieved such abuses of our national wards abroad). After stamping Petitioner entered for sixty days on a visa issued by TECO DC under Dr. Joanne Chang, the Kaohsiung airport immigration officers recalled Petitioner to their desk and detained him, cancelling the entry admission stamp on his passport. Previously on December 15, 2005, the Taiwan authorities had illegally arrested Petitioner as his inviolable (Third amendment, UN Charter, Convention on Privileges and Immunities of the UN) premises alleging an overstay. AIT officers dispatched to Petitioner in custody assaulted Petitioner by crumpling and throwing an email from Maysing Yang (Amerasia Bank, Taiwan Democracy Foundation, Ministry of Foreign Affairs, Overseas Compatriots Commissioner) evincing Petitioner's status as Special Adviser for International Law to the Permanent Mission of Tuvalu to the United Nations. Roger Tsungmin Hsieh, who acting for Shuibian Chen, had tasked Petitioner to engage his Tuvaluan interlocutors including the Prime Minister Saufatu Sopoanga and Ambassador Enele Sopoaga (brothers), for a Taiwan confederation project, wired funds for Petitioner in the US. Then Petitioner proceeded to Washington DC to negotiate through counsel and with the Taiwan authorities for a visa after his passport was re-issued. During that time Petitioner visited the National Archives reviewing declassified documents on the status of Formosa and the occupation of Formosa(US Navy film, October 25, 1945).

Oklahoma law requires a prosecutor or her investigative agents like Child Support Enforcement officers, Linda Stinnett, or the Minnesota equivalents, or Jana Ford, should conduct a good faith inquiry to determine whether the alleged nonpayment was made without lawful excuse. They failed to do so.

Moreover since STATE v. RICHMOND, 102 Wn.2d 242 (1984), 683 P.2d 1093, all of the law officers and investigators or child support enforcement officers, have been on notice that the language in the Oklahoma statute, which mirrors the Washington language, is unconstitutional under the federal Constitution, as violative of due process, and equal protection of the laws, for Indians, because the "without lawful excuse" language is too ambiguous and speculative to apprise a putative nonpayor of what might constitute such a lawful excuse. Not knowing what might constitute lawful excuse makes it impossible to form any mens rea requisite to conviction duly obtained with due process, or to engage in any voluntary actus reus sufficient to comport with due process or a conviction duly obtained. It cannot be that the exact same language is constitutional in Oklahoma under the US Constitution but unconstitutional in Washington under the same US Constitution. Such a farcical state of affairs could only the law into utter contempt for his arbitrariness.

Thus, none of the investigative officers, nor the other officers of this Court, are entitled to any immunity whatsoever. Moreover their joint real intention was to deprive the Formosans of their civil rights to self-determination such as through formation of a confederation with the Tuvaluans, also conquered by the US in the second world war with Japan in the Pacific, and not relinquished from claims as Principal Victor thereon until the 1980 Friendship Treaties. The conspiratorial co-tortfeasors aimed to deprive Petitioner, his family, and the Formosans, of their rights of petition, by depriving Petitioner of his passport and other important liberty, through false arrest December 15, 2005 by the Taipei County Foreign Affairs Police officers (whose office is next to an illegal brothel where victims of international human trafficking languish subject to the jurisdiction of the US). The false arrest continued under the authority of the AIT Taipei officers who directed and controlled the course and conduct and location of Petitioner's detention, threatening to move custody from the Banqiao Stationhouse basement jail, to the foreigners prison, even though Petitioner as a Native American Choctaw (8 USC 1401(b)) and an allied United Nations national, not a "foreigner" to the US military government authorities on the islands (any claim otherwise would seditiously interrupt our authority, contrary to 18 USC 2384).

Tim Kuykendall is responsible for the co-tortfeasor conspiracy by respondeat superior over Ms. Ford, Linda Stinnett, and Sue McKenzie (Norman Child Support Enforcement), Jana Ford Esq. (officer of this Court). Process in this Court was filed under Kuykendall's authority. Said process was knowingly filed

under a false name, Robert.

Washington County Community Services, Kari Ann Lindstrom, Patricia Kinzer, Theresa Wilson, and Jenna Pennfield, knowingly initiated the conspiracy with the co-tortfeasors and failed to enquire consistent with the law of Oklahoma or Minnesota, as to existence in fact of lawful excuse for nonpayment. They had knowledge from the public records of Minnesota that Dr. Pengfei ZHANG or Zhang Shushu, had feloniously abused A.R.Y.L.L.R. in Minnesota, and they failed in their duty to protect the Indian child (A.R.Y.L.L.R.) and family (on Formosa), knowingly and willfully, maliciously abusing process to prevail on Minnesota to prevail on the US Department of Health and Human Services to prevail on the US Department of State to deprive Petitioner of his US national passport (8 USC 1401(b), 8 USC 1503). No due process protections were accorded Petitioner in fact, nor otherwise. Minnesota and Oklahoma have refused any means of legal redress or any forum for determining arrearages and lawful excuse against the same, in spite of repeated judicial pleadings, habeas writ proceedings, modification proceedings in the federal and state courts, respectively, in Minnesota and Oklahoma. The Taiwan courts had docketed a modification hearing which would have applied Oklahoma law, but the hearing would have had to proceed in absentia, during Petitioner's enforced illegal exile from the islands, and were thus mooted by the facts on the ground. They conspired to deprive Petitioner of the rights in comity to judicial review prior to such illegal rendition, contrary to 18 USC 3185, due process, and the Treaty renouncing Japanese administration consonant Joint Chiefs of Staff Order 1381/15 and SCAPIN 677, and the Opinion of the Attorney General on rendition from areas under US military government following allied occupation after evacuation and treaty renunciation/relinquishment:

http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS.FRUS1899&entity=FRUS.FRUS1899.p0411&q1=extradition&q2=cuba&q3=germany .

Gregory Brooker, Secretary Rice, the American Institute Taiwan John and Jane Doe(s), conspired to deprive Petitioner of the aforementioned rights, by ordering his detention at Banqiao, threatening detention in the foreigners prison (depriving rights of nationality, contrary 8 USC 1503, and contrary the privileges and immunities of nationality to protection (Slaughterhouse Cases)), assaulting in detention with Maysing Yang's email, and pretending 22 CFR 51.1 did not include Formosa such that removal from the island was somehow lawful even though the island remains subject to the jurisdiction of the US

claims as Principal Victor (Smith v US, Rehnquist, fn1). Brooker failed his duty of candor to the Courts on the status of Formosa within the US under the treaty ad interim disposition pending final disposition consonant UN Charter Article 107 recognition of the US as Principal Victor and the Peace Treaty recognition of the US as superintendent Principal Occupant command authority. Ying Liang, and Dr. Pengfei Zhang, with Nancy and Terry Risenhoover, conspired with their co-tortfeasors, to deprive A.R.Y.L.L.R. of his civil rights as a Choctaw and Formosan Indian, to reside on Formosa with consortium, to enjoy the Court's order he travel to Formosa, to enjoy the Court's order they cooperate with providing his passport (8 USC 1401(b)) to Petitioner. Ying Liang and Nancy and Terry Risenhoover also conspired to kidnap A.R.Y.L.L.R. while a disabled minor child Indian, from Norman, OK, to Kingfisher, OK, in "Indian country", without lawful authority or lawful excuse, contrary to the Court order of sole legal and physical custody in and with Petitioner alone, in December 1996, not long after the housefire at 700 Chautauqua, Norman, OK, and contrary to A.R.Y.L.L.R. best interests merely because Petitioner intended to move to Arizona with A.R.Y.L.L.R. and begin studying for the bar exam there and start a practice if possible. The invidious racism against the Formosans runs throughout the entire course of the conspiracy among all the co-tortfeasors.

https://ecf.ksd.uscourts.gov/cgi-bin/show_public_doc?2010cv2051-11
Johnston v Stone, USDC Kansas, No. 10-2051,
Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007) ,Roska v.
Peterson, 328 F.3d 1230, 1244 (10th Cir. 2003),Novitsky v. City of Aurora, 491 F.3d 1244, 1258 (10th Cir. 2007)
(noting that a malicious prosecution claim can be grounded in both the Fourth and Fourteenth Amendments); Pierce v. Gilchrist, 359 F.3d 1279, 1285-86 (10th Cir. 2004).
"Arrest warrant affiants violate the Fourth Amendment when they knowingly . . . or with reckless disregard for the truth, include false statements in the affidavit . . . or knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause."
Bruner v. Baker, 506 F.3d 1021, 1056 (10th Cir. 2007) (internal citations and quotation9 marks omitted). See, e.g., Poolaw v. Marcantel, 565 F.3d 721, 728-29 (10th Cir. 2009); Wilkins v. DcReyes, 528 F.3d 790, 799 (10th Cir. 2008); Pierce, 359 F.3d at 1285-86; Wolford, 78 F.3d at 489.
Constitutional right of travel throughout the US including the island of Formosa or Palau, see Jones v. Helms, 452 U.S. 412, 418 (1981) (recognizing the

"fundamental nature" of a United States citizen's right "to travel from one State to another and to take up residence in the State of his choice"); see also Zobel v. Williams, 457 U.S. 55, 76-77 (1982) ("It is difficult to imagine a right more essential to the Nation as a whole than the right to establish residence in a new State.").

Petitioner NOW therefor also asks this Court to determine that protest against felonious racist child abuse including a broken arm and persistent mental abuse and cruelty on the basis of Indian child status and race and national origin, constitute "lawful excuse" for purposes of refusing child support payments. Viz Oregon v Nuzman,

http://www.publications.ojd.state.or.us/Publications/A120133.htm *State v. Timmons*, 75 Or App 678, 681, 706 P2d 1018, *rev den*, 300 Or 451 (1985). A "lawful excuse" commonly refers to "some condition, not of the defendant's own making, which prevents the defendant from being able to provide support." *Id.*  Accord Johnston v Stone, USDC Kansas, Case No. 10-2051, https://ecf.ksd.uscourts.gov/cgi-bin/show_public_doc?2010cv2051-11, Rather, the prosecutor moved to recall the arrest warrant after having been advised of Detective Stone's actions; the district court granted that motion on February 5, 2009.

**Child Support: Nonpayment: Lawful Excuse: Burden of Proof.** The appellant was charged with Felony Nonpayment of Child Support, under Minn. Stat. ¤ 609.375, subd. 1 (2000). The relevant period of time of nonpayment was 1995 through 1999. …

Held, it was an error for the trial court judge to instruct the jury that the defendant had the burden to prove his mental incapacity (lawful excuse) by the weight of the evidence. Instead, the defendant was required to make only a prima facie showing of the lawful excuse. Once a showing is made, the burden then shifts to the prosecution to prove beyond a reasonable doubt the lack of a lawful excuse. *State v. Douglas Gerard Burg*, C6-00-1822, 633 N.W.2d 94 (Minn. App.

9/18/01). www.lawlibrary.state.mn.us/archive/ctappub/0109/c6001822.htm

**Minnesota Statutes 609.375 NONSUPPORT OF SPOUSE OR CHILD. Subd. 8.Defense.** It is an affirmative defense to criminal liability under this section if the defendant proves by a preponderance of the evidence that the omission and failure to provide care and support were with lawful excuse.

**170 F.3d 871: 99 Cal. Daily Op. Ser v. 1805, 1999 Dailyjournal D.a.r. 2325 United States of America, Plaintiff-appellee, v. Jeffrey A. Ballek, Defendant-appellant,   Among the questions we consider is whether, so**

**construed, the CSRA(18 U.S.C. § 228) violates the constitutional prohibition against slavery.**

In making such an award, the state courts take into account a variety of factors, including the non-custodial parent's other obligations and his ability to pay child support; if circumstances change, the obligor can return to court and seek to have the amount reduced. See Alaska Stat. § 25.24.170 (Michie 1998); Curley v. Curley, 588 P.2d 289, 291 n. 2 (Alaska 1979).

Given this means-testing, which is an integral aspect of every child support award, a non-custodial parent should never be confronted with a situation where he is ordered to make child support payments he cannot afford. "…one of the most important and sensitive exercises of the police power-ensuring that persons too young to take care of themselves can count on both their parents for material support."

"Nevertheless, there clearly comes a point where potential punishment other than incarceration may be so severe that the offense will no longer be considered petty. See, e.g., Twentieth Century Fox Film Corp., 882 F.2d at 663. "

http://courts.michigan.gov/supremecourt/clerk/10-11/141154/141154-Appellant Brief.pdf, In People v Likine, the ACLU brief cite to authorities in almost every state providing that inability to pay constitutes lawful excuse.

An involuntary omission is not a voluntary actus reus for which probable cause that a crime had been committed might exist.

http://www.leagle.com/xmlResult.aspx?xmldoc=1984344102Wn2d242_1324.x ml&docbase=CSLWAR1-1950-1985 STATE v. RICHMOND, *102 Wn.2d 242 (1984),* 683 P.2d 1093

We agree with the trial judge that the statute is unconstitutionally vague under the due process clause of U.S. Const. amend. 14 because the "without lawful excuse" element has not been sufficiently clarified by statute or case authority. This holding is consistent with two recent rulings of this court which criticized the lack of constitutionally required precision in the words "lawful excuse."

 Due process under U.S. Const. amend. 14 and Const. art. 1, § 3[1] requires that penal statutes be drawn with sufficient specificity so that persons of common understanding will be on notice of the activity prohibited by the statutes. **102 Wn.2d 244.** *Buckley v. Valeo,* 424 U.S. 1, 46 L.Ed.2d 659, 96 S.Ct. 612 (1976); *Seattle v. Rice,* 93 Wn.2d 728, 612 P.2d 792 (1980). An equally important purpose of the doctrine is to guarantee that criminal convictions are not based on arbitrary or *ad hoc* determinations of criminality. *Kolender v. Lawson,* 461 U.S. 352, 75 L.Ed.2d 903, 103 S.Ct. 1855 (1983); *Seattle v. Rice,*

*supra*. Recently, however, the Supreme Court has stated that the most important purpose to be served by the vagueness doctrine is "the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, at 358.

http://courts.michigan.gov/supremecourt/clerk/10-11/141513/141513-Amicus-PAAM.pdf   No. 82,852, IN THE COURT OF APPEALS OF THE STATE OF KANSAS STATE OF KANSAS, *Appellee,* v. JOHN E. FILOR, *Appellant.* 1. Criminal nonsupport of a child has three essential elements: (1) The defendant is the parent of a child under 18 years of age; (2) the defendant failed, neglected, or refused without lawful excuse to provide support and maintenance for the child; and (3) the child was in necessitous circumstances. Constitutional mandates require that each element be proven beyond a reasonable doubt.

2. The phrase "without lawful excuse" is equivalent to "without just cause." The term "just cause" includes considerations such as mental incapacity or physical disability of the defendant, as well as financial conditions which the defendant has honestly, in good faith, endeavored to overcome.

The phrase "without lawful excuse" is equivalent to "without just cause." *State v. Kirkland*, 17 Kan. App. 2d 425, 431, 837 P.2d 846, *rev. denied* 251 Kan. 941 (1992). The term "just cause" as used in the law, means any cause of sufficient import to relieve the defendant, who under the law is charged with the duty of providing for the support and maintenance of his child, from such duty and legal obligation, such as mental incapacity or physical disability of the defendant, rendering him unable to provide for the support and maintenance of such child; or financial conditions which the defendant has honestly, in good faith, endeavored to overcome. See *Kirkland,* 17 Kan. App. 2d at 429."Destitute" and "necessitous" mean virtually the same thing. They mean needing the necessaries of life, and the necessaries of life cover not only primitive physical needs, things absolutely indispensable to human existence and decency, but those things also which are in fact necessary to the particular person having the right to demand support and maintenance. *State v. Knetzer*, 3 Kan. App. 2d 673, 674, 600 P.2d 160 (1979). It is no defense to a charge of failure to provide for a minor child that the mother of such child, or any other person or organization, voluntarily or involuntarily furnishes necessary food, clothing, shelter, medical care, or any other remedial care for the child during the period of time the defendant failed to do so. 3 Kan. App. 2d at 674-75. In *Knetzer,* a child was in necessitous circumstances where the defendant's ex-wife worked two jobs in an effort to support her family, yet still had to rely on

her family, church, and proceeds from a life insurance policy for assistance. *Knetzer*, 3 Kan. App. 2d at 675.

Mere nonpayment of support, without more, is not enough to convict a person of criminal nonsupport. There must be evidence that the child was in necessitous circumstances. See *State v. Selberg*, 21 Kan. App. 2d 610, 612-13, 904 P.2d 1014 (1995). Where the facts warrant, a child is deemed to be in necessitous circumstances if the child would have been in that condition had he or she not been provided for by someone else. *State v. Sokolaski*, 26 Kan. App. 2d 333, Syl. ¶ 3, 987 P.2d 1130 (1999).

"We finally come to the critical question of whether the children are in necessitous circumstances. In 1997, Denise was employed at a gas station. She worked between 60 and 80 hours per week and relied on her 75-year-old mother to provide child care. Denise now works for the State of Kansas as a legal assistant. Denise's net income is $750 every two weeks. She pays approximately $100 for health insurance for herself and the children.

Denise cannot provide for the children on her income alone. Her furnace malfunctioned a few years ago and her home was without heat. Denise borrowed approximately $5,000 from her mother. Denise is currently attending college. She takes out the maximum amount of student loans in order to help with the children's expenses. Denise received some public assistance but worked to get out of that system. Denise says her family does not eat very well. Denise buys the children's clothing at garage sales or thrift stores.

Denise is currently making payments on the family's mobile home. The basement of the trailer is not inhabitable because of water leaks. The children sleep three to a room, with the exception of the oldest, and Denise sleeps on the couch. The roof of the trailer has leaked for 2 years. Denise cannot afford to have it repaired. The bathroom floor is rotten. The kitchen sink is supported by railroad ties and there are no kitchen counters.

We agree with the trial court's finding that the children were in necessitous circumstances. The children are without adequate shelter or food. We believe there is sufficient evidence in the record on appeal to show that the children are in necessitous circumstances."http://www.kscourts.org/cases-and-opinions/opinions/ctapp/2000/20001201/82852.htm

Facts

1. Defendant is an Indian not taxed (8 USC 1401(b), Supremacy Clause, Article VI, US Constitution, fourteenth and fifteenth articles of amendment

thereto), of Choctaw heritage, see Dawes Roll, Choctaw, Sullinger, and US District Court for Indian Territory Choctaw marriage records, Sullinger. Ying Liang is a Formosan Indian, born on mainland China.

2. In the original **No. FD-1994-1447 in this Court,** 03-20-1995, the Court order violated the Indian Child Welfare Act and special fiduciary duty of these United States to her Indian wards being persons non sui juris and non compos, as Defendant and his son, A.R.Y.L.L.R., with high functioning autism/Asperger's Syndrome/hyperlexia, and said order is void ab initio as violating public policy, the ICWA, the occupation incident fiduciary duties to Indians not taxed, and the equal protection of law. Ying Liang through counsel contrived to enjoy no duty of support for the minor Indian child, as the plain face of the order provides, the stipulated calculations of support being miraculously equal to purported property settlement in equal monthly amounts through the minor Indian child's minority.

3. Defendant is completely and permanently disabled from C/6-7 spinal vertebrae injuries from a bicycle on Benz accident on the island of Formosa renounced from Japanese administration in the Treaty of Peace concluded with Japan at San Francisco, 1951, said island excluded from Japan for purposes of the US Japan FCN Treaty Protocol through Articles 13 and 14 thereof, being islands "subject to the jurisdiction" of the US (22 CFR 51.1, see order, Judge Ann Montgomery, Risenhoover v Washington County Child Support Services and Secretary Rice, USDC MN, holding relief moot because the Secretary re-amended the regulations to re-include the island of Formosa as among islands subject to the jurisdiction of and thus within therefor the United States)(accord Chicago ICAO Convention protected territory, FRUS series application to Okinawa http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS .FRUS195254v14p2&entity=FRUS.FRUS195254v14p2.p0269&q1=ryukyu &q2=protection&q3=convention, but see contra, US v Ushi Shiroma). Defendant either reclines completely or uses a special ergonomic chair with special headrest to support his spinal column and alleviate constant chronic pain and debilitating bilateral numbness. Any movement by vehicle results in temporary paralysis of Defendant, even with prodigious use of shock absorbent neck bracing. Defendant is under the care of licensed physiatrists or neurologists/neurosurgeons, and maintains rehabilitative aquatherapy activities to ameliorate the total disability. Defendant additionally suffers from organic neurodifference since youth, and severe PTSD and anxiety disorder. Defendant rarely leaves home, and never

attends public events, meets strangers, nor is able to competently engage
in normal routine life activities such as job interviews. Defendant is cared
for by his spouse full-time. Defendant's daughter native born to the island
of Formosa is also diagnosed, as A.R.Y.L.L.R. (diagnosed around
November 1996) with Asperger's and exhibits the characteristic abstract
language use deficits of hyperlexia in the Formosan language context (25
USC 2901 et seq.).

4. Ying Liang, BSc Clin.Lab.Sci. (OUHSC) with distinction and MBA (UW-M),
is a Formosan Indian of the Siraya Pingpu (PeoPo) Indians, born on
mainland China, she is deemed by the Chinese authorities to be Formosan,
through her father (Baomin Liang, US patented professional Scientist at the
University of Wisconsin at Madison), and paternal grandfather Dr. Yonglu
Liang (Dr. Yunglu Liang), of Tainan.

5. Because of the sensitive nature of the status quo of the island of Formosa it
was not prudent to aver the Indian child status in the initial proceedings,
and the US has ensured that the parties were unable then to have any
appreciable knowledge of the Indian status issues, see
http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS
.FRUS1944v05&entity=FRUS.FRUS1944v05.p1255&q1=formosa&q2=war
ds,
http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS
.FRUS1944v05&entity=FRUS.FRUS1944v05.p1280&q1=formosa&q2=war
ds,
http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&entity=F
RUS.FRUS1946v08.p0199&id=FRUS.FRUS1946v08&isize=M&q1=taiwan
ese&q2=nationality,
http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS
.FRUS1946v08&entity=FRUS.FRUS1946v08.p0370&q1=taiwanese&q2=n
ationality.

6. The facially incoherent affidavit alleges "delinquent... has accrued since
Sept. 1, 1993," but recites that April 11, 1997, the District Court approved
Ying Liang's counsel's ex parte order which counsel had discussed ex parte
with the Court in Chambers prior to the hearing and contrary to judicial
ethics and law.

7. Defendant was non compos mentis ad interim during the entire April 11,
1997 proceedings. See the inchoate Court Reporter transcription of the
proceedings. Also see the Defendant's extensive prepared statement to the
Court evincing non compos mentis status. Those ex parte proceedings and

judgment are as a matter of law, void ab initio. Defendant never had the means of paying $500 per month, and has never been gainfully employed in a manner sufficient to obviate a legal condition of permanent and complete disability. Defendant has been at all times relevant non compos and non sui juris, thus with lawful excuse for any nonpayment.

8. The Affidavit does not say that the affiant investigated any of the facts, nor that she determined that Defendant    "has become delinquent" contrary to law, or without lawful excuse, as required among the elements of the offense alleged in the Information or amended Information.

9. The Amended Information then alleges between February 1999 and December 2005, that Defendant was present "in Cleveland County, State of Oklahoma", a

counterfactual assertion, as Minnesota and Oklahoma both new Defendant was then permanently legally domiciled on the island of Formosa. Defendant had by email and phone complained to the Woodbury Police Department, and Officer Todd Jagodinski, thereof, of the continuing countenancing of civil rights violations in the household of Ying Liang, by Dr. Pengfei ZHANG (only know as "Shushu", meaning, maternal uncle, but referring to any adult male or in context, a boyfriend), against A.R.Y.L.L.R. based on his not being Chinese enough, or being too Indian, too Formosan, or too Choctaw for Dr. Zhang's racist pure Chinese sensibilities.

10. The amended Information alleges violation of 21 OS 852(A), through "lawfully, willfully, and feloniously, and without lawful excuse, become delinquent" ... "for the support of his minor children", and against "the peace and dignity of the State of Oklahoma". Defendant is an Indian not taxed, and without the jurisdiction of the said "peace and dignity of the State of Oklahoma", see US Constitution, Elk v Wilkins, US v Wong Kim Ark, Respublica v Mesca, Rubi v Mindoro, Duarte v Dade, Carino v Insular Government of the Philippines, Worcester v Georgia, US ex rel Standing Bear v Crooker, USA v Rogers. Moreover, Defendant lawfully complained to the authorities constituted as Minnesota for their protection of the Indian child, A.R.Y.L.L.R., and Officer Jagodzinski replied by email that such complaints were without merit. Now Ying Liang by email with Terry Risenhoover has admitted of the course of long civil rights violations against A.R.Y.L.L.R. by Dr. Pengfei Zhang in the household maintained by Ying Liang, contrary to 42 USC 1981 et seq. and the special fiduciary duties owed persons non compos mentis or non sui juris as Indians or laboring with Asperger's syndrome/hyperlexia/autism. Protection of a child against such ongoing abuse,

is lawful excuse, 21 OS 852(A), as to provide otherwise would constitute a cruel and unusual punishment permitting constructive vicarious punishment of third parties contrary to natural justice and law, and vitiating the due process guarantees of the US Constitution for her Indian wards.

11. Affiant, claims she had "examined the facts in this case". In fact, Affiant never attempted to contact Defendant to ascertain any of the facts at all. Nor did she contact anyone else to ascertain any facts. Nor did she attempt to contact the child, nor the actual custodial superintendents of the child in Oklahoma.

12. Affiant alleges witnesses to be "Yin Liang, 3001 Juniper Ln, Woodbury, MN 55125" and Sue McKenzie, Norman Child Support Enforcement.

13. This Court held the proper forum for adjudication of any arrearages or attendant claims, was Minnesota, in response to an ex parte in absentia habeas petition filed electronically with Chambers and the Court from the island of Formosa. Formosan law, Choctaw law, and Minnesota law, as Oklahoma, permits determination that an Indian child with disability remains an adult for whom support duties continue from the Indian parents.

14. Defendant has filed for civil guardianship ad litem for relief of A.R.Y.L.L.R. with the United States military government authorities on the island of Formosa, at the Taiwan Tainan District Court family docket Case No. 2, pending IFP motions now, and in support whereof has filed 28 USC 1782 foreign tribunal deposition assistance petitions with the US District Court in Oklahoma City and Minnesota, to obtain testimony admitting persistent child abuse and emails admitting same, of Ying Liang, Dr. Pengfei Zhang, Ecolab Inc. (possible holder of emails and financial information, insurance information, (non-)dependents information), Harrah based missionaries Don and Merrilee Hardy (who heard firsthand from A.R.Y.L.L.R. allegations of the long physical and mental abuse by Dr. Pengfei Zhang), and the actual custodial superintendents, Terry and Nancy Risenhoover, Norman, OK. Said petitions are pending with the federal courts with proper IFP motions.

15. Defendant is owed in at least by quantum meruit principles, US one million dollars in consulting fees for the Taiwan Tuvalu Confederation project assigned him by Roger Tsung-min Hsieh, then National Policy Adviser to the President Shuibian Chen (now in post-conviction detention on the island). Tort claims and other petitions for redress have not been substantively heard, and civil claims are inhibited by the unreviewable blacklisting exclusionary authority claimed by civil servants on the island

(who previously blacklisted Defendant for a term of ten years exile from his domiciled family thereon). Defendant would happily assign those claims to any proper authority or the Court, to prosecute on Formosa, to secure relief for all concerned. Defendant would also happily agree to the Court appointing counsel to prosecute the claims against Dr. Pengfei Zhang, Ying Liang, and Ecolab Inc., 3M Inc., John Does, Todd Jagodzinski, Washington County Child Support, etc., for their conspiracy to deprive A.R.Y.L.L.R. of his Indian civil rights and the protection due him, for NONE of those charged by law with protection even attempted to ascertain any of the facts which would have helped protect him from the racist abuse.

16. To protect A.R.Y.L.L.R. from the abuse, the Harrah, OK, missionary couple, Don and Merrilee Hardy (http://www.facebook.com/profile.php?id=1311404958), paid US$15,000 by checks to Minnesota.

17. Ying Liang by email and on her public blogs online admit and stipulate to the said abuse contrary to law and duties and in derogation of Aaron's best interests: to wit, http://blog.sina.com.cn/s/blog_5cd5b9b80100uff5.html

2004-04-26 12:05:52 (translation from Mandarin)

Boyfriend is my love and also my source of troubles. Nothing in life is perfect. He loves me, but he certainly doesn't love Aaron. We often fight about him. I always feel like he is comparing Aaron to normal children, and not tolerant enough, impatient, and fails to see the child's progress, always focusing on the inadequacies, with a defeatist attitude. He feels like my discipline is ineffectual and half-hearted, too forgiving, and Aaron just doesn't have any fear of me at all. But, he doesn't have any experience in disciplining children, having had a traditional stern upbringing, and I am so angry the steam is bursting from my ears, thinking about my complaining about him not being "tolerant enough", perhaps I could use a little more tolerance too.

We raised a puppy together, called Hairy (Maomao), hoping it would provide him "experience in disciplining children". As things would have it, our dog is the most cantankerous in the neighborhood. Ahhh Que sera sera…

18. -----Original Message-----
    From: Ying Liang [mailto: y_snow@hotmail.com]
    Sent: Thursday, February 02, 2006 9:42 PM
    To: terryrisenhoover@direcway.com
    Subject: RE: unfortunate facts

Hi, Terry:

I talked to Shu Shu and we came up with some resolutions. Shu Shu is willing to maintain a separate household, even after we get married. We can give up the big house we are building, keep the current townhouse and buy   another townhouse, or my parents, me and Aaron can live in the big house and Shu Shu buy a separate townhouse. Does this address your concern?

My concern is that you don't have enough time to put into Aaron's home   school. It seems you're busy all the time and Aaron is mainly looking on the internet everyday, reading about his pet subject. So far, I don't see any structure or short term goals being set. I don't want Aaron to "relax"   through the high school years, then feel sorry later when it is time for him to face life. You are not going to be around forever to take care of Aaron.
He can choose not come to me when he is 18, but he will still need me. My   sister did not leave home until she was 25, and she does not have AS. You don't realize how competitive today's workplace is. When you assume Aaron can become a good teacher, but you don't work with him on the skills he   needs to be a teacher, or even admits he needs the skills to be a teacher, that's not being responsible for Aaron. When you assume Aaron can go to
college, but does not work with him on the part he needs to pass the entrance exam, that's not being responsible for Aaron.

Ying

>From: Terry Risenhoover < terryrisenhoover@direcway.com>
>To: 'Ying Liang' <y_snow@hotmail.com>
>Subject: unfortunate facts
>Date: Thu, 02 Feb 2006 12:59:43 -0600
>
>Battered-child syndrome has only been clinically recognized since 1962,
>when >the concept of child abuse as a disorder finally came to recognition
>through >the work of Henry Kempe and associates. Although research
after this   >declaration was extensive, the question of step- versus
genetic-parent >homes>as a variable in assessing the risk of child abuse

was overlooked for >twenty >years. Then, in 1980, evolutionary psychologists Martin Daly and Margo I.  >Wilson reported that "stepchildren constituted a much higher proportion of >U.S. child abuse cases than their numbers in the population at large would >warrant." (Daly and Wilson, 1996, p. 78) Their 1996 paper entitled >"Violence >Against Stepchildren" is a follow-up analysis relating the disparity >between >the frequency of abuse incurred in homes with a step-parent and those of >genetic parents. The applications of this study go beyond simply assessing >a >child's risk to possibly helping reduce the frequency of such abuse in the >future, and in my opinion, the study addresses one of the most significant

>cross-cultural social problems of human history. A stepfather is 250 times   >more likely to abuse his stepchild than the biological parent.>
>Ying this abuse has already happened to Aaron by ShuShu and while you may >want to think otherwise we believe Aaron and we believe the national   >statistics. Now at Aaron's age and size he is capable of inflicting severe >injury upon ShuShu and again it is well documented that many stepchildren >when repeatedly provoked will severely injure or kill their step parent.

>While you have been told that all is forgiven between Aaron and ShuShu that >is not true. Aaron has told us that when he and ShuShu are alone

█████████████████████████████████████████████

████████

█████████████████████████████████████████████

██████████████████████████████and many many ridiculous and abusive >statements. Aaron must not under any circumstance be left alone with ShuShu   >because Aaron feels intimidated and threatened and he is angry and hurt >over

>the abuse that was inflicted upon him. Aaron loves you but he does not >understand your relationship and does not want to be a part of it. If he   >continues to stay here he will heal and mature and learn to love and trust >again.

>>ShuShu violated Aaron's trust and yours and it will take many years to >restore. Do not underestimate the level of anger that Aaron has toward  >ShuShu >

>It is good that you feel depressed because this is what Aaron has felt >everyday that he has been subjected to the psychological abuse from ShuShu. >Aaron is now happy and healthy and safe and at peace. Sending

Aaron here >has

>been best for everyone and keeping him here is best for everyone.
Teenagers >do not want or need their parents nearly as much as parents
think they do.

>You must continue to put Aaron's interests ahead of yours and you
must >structure your vacation times where they will be times of enjoyment
and not >frustration and  if possible exclude ShuShu until Aaron has healed
more and >matured.

>

>This is what I have wanted to discuss with you for several weeks
since  >Aaron >brought up ShuShu's abuse. I actually wrote this early this
morning before >receiving your email. So I do not feel it is in Aaron's best
interest to >have him return and he definitely does not want to return. I ask
you to   >prayerfully re-consider. Terry

19. Japanese Formosans such as Ying Liang have long been subject to racist
    treatment by Chinese, referring to them pejoratively using the Japanese
    legal term of art, "Taiwan compatriots" or "Taiwanese compatriots".
20. Dr. Pengfei Zhang probably does not appreciate that his children through
    Ying Liang are Japanese Formosan Indians (8 USC 1401(b)), not "pure
    Chinese".
21. Dr. Pengfei Zhang previosuly by phone prevailed on A.R.Y.L.L.R. to
    demand funds be sent, and thus the abuse, by Dr. ZHANG, proximately
    arises from acts of vicarious punishment incident Defendant's status as an
    Indian not taxed and a neurodifferent, disabled Indian, see fn1, dissent US
    v Wong Kim Ark on vicarious punishment for Chinese expatriation, and
    accord,
    http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS
    .FRUS188081v01&entity=FRUS.FRUS188081v01.p0401&q1=vicarious&q
    2=punishment,
    http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS
    .FRUS1902&entity=FRUS.FRUS1902.p0324&q1=vicarious&q2=punishme
    nt.
22. Sue McKenzie (Norman Child Support Enforcement), Jana Ford (officer of
    this Court), Washington County Community Services, Kari Ann Lindstrom,
    Patricia Kinzer, Theresa Wilson, Jenna Pennfield, Gregory Brooker,
    Secretary Rice, the American Institute Taiwan, Ying Liang, and Dr. Pengfei
    Zhang, with Nancy and Terry Risenhoover, have conspired in fact, abusing

the process of this Court, to deprive Defendant of liberty, travel, a US passport (8 USC 1401(b)), and familial consortium with his Formosan and Choctaw Indian native born to the island or native born on Oklahoma, together on Formosa, though this Court ordered A.R.Y.L.L.R. passport be provided to Defendant and permitted to travel to the island. Instead, Terry Risenhoover has unlawfully retained the passport. Ying Liang has abandoned the child, since February 2006 or earlier, to the actual custodial superintendents, now on Oklahoma, Terry and Nancy Risenhoover.

23. The Court and officers thereof certainly knew at all times that Defendant is not named Robert. Defendant has never used such a name. Defendant's Formosan Indian legal name as registered with the US military government Formosa is Dr. Paul Chen (phonetically transcribed).

24. Defendant prays the Court by writ of habeas corpus ad testificandum or ad subjiciendum compel the actual custodial superintendents in Norman to provide access to the Court to A.R.Y.L.L.R. to ascertain their factuality of his abuse under color of state law and authority as noted in paragraph 22 and supra, and his desire to rejoin his father on Formosa, properly, with a proper visa, permitting establishment of domicile thereon, and thus establishing jurisdiction therein for prosecution of the civil and other claims for his benefit against the co-tortfeasors and those criminally responsible for his abuse by Dr. Pengfei Zhang in Minnesota and by phone to the island of Formosa.

25. Ying Liang conspired with counsel to contrive to obtain a decree of divorce contrary to public policy, in 1994, providing through A.R.Y.L.L.R. minority, Ying Liang would have no duty to pay Petitioner child support for the minor Indian child. A contrived fictitious property settlement payment of US$184 was invented in exact amount of the support guidelines amount due based on actual income levels at the time, so Ying Liang could knowingly, willfully and without lawful excuse, avoid any duty to provide support for A.R.Y.L.L.R. Ying only sought recoupment of her parents US$15,000 house down payment at divorce, and relinquished A.R.Y.L.L.R. completely. Petitioner was the primary caregiver for A.R.Y.L.L.R. and housemaker for Ying Liang, preparing her breakfast, lunch and dinners, and carry out meals for her work at Presbyterian Hospital OKC, throughout the marriage even while completing law school. Paternal grandmother provided only intermittent though regular care for the minor child, but was not his primary caregiver.

Prayer for Relief

1. Declaratory judgment that Petitioner was illegally renditioned by the US military government Formosa through AIT to Oklahoma in December 2005.

2. Compensation for the illegal torture, arrest, detention, battery by AIT Taipei, and the agents in fact on the ground for the US military government Formosa styled the Taipei County police or Kaohsiung Airport police (both subject to the President, Secretary of Defense, and CIA, see Glomar response in FOIA requests of Petitioner and the FRUS series http://digicoll.library.wisc.edu/cgi-bin/FRUS/FRUS-idx?type=turn&id=FRUS .FRUS1950v06&entity=FRUS.FRUS1950v06.p0387&q1=chiang&q2=strub le).

3. Declare A.R.Y.L.L.R. to be a disabled adult child, entitled to child support orders for adults with disabilities under Section **112.1**A of Title **43** of the **Oklahoma Statutes, and the Minnesota equivalent, said orders to issue from the Taiwan Tainan District Court family docket.**

4. **Declare Petitioner and A.R.Y.L.L.R. entitled consortium on Formosa as the District Court in Cleveland County previously ordered, finding the conspirators in contempt thereof, and ordering the Secretary of State to issue a new passport for A.R.Y.L.L.R. directly to Petitioner, cancelling any other passport for A.R.Y.L.L.R. and requiring replevin to the Clerk of the prior passport for A.R.Y.L.L.R. by Terry and Nancy Risenhoover.**

5. **Declare that A.R.Y.L.L.R. be immediately safely transported to Formosa, with a proper escort such as Justin Hsieh, a US citizen, to enjoy the consortium long denied.**

6. **Declare that Ying Liang conspired with Terry and Nancy Risenhoover in December 1996 to kidnap the minor child, A.R.Y.L.L.R., without lawful excuse, and did so kidnap the child from Norman, OK to Kingfisher, OK, all, or, in Indian country.**

7. **Declare that the Taiwan Tainan District Court is a proper form after the arrival of A.R.Y.L.L.R. from his present domicile in Oklahoma, to the island to determine any arrearages, lawful excuse wherefor, modifications, retroactive reductions, and to establish** child support orders for adults with disabilities under Section **112.1**A of Title **43** of the **Oklahoma Statutes, and the Minnesota equivalent, since Judge Bonner waived jurisdiction** Jul 11 2008 11:48:32:477AM holding "O: PETITION FOR EXTRAORDINARY WRIT OF HABEAS CORPUS. AD? REQUEST IN FORMA PAUPERIS AND MOTIN TO SETTLEMENT. EX

PARTE HEARING IS ABSENTIA IN FORMA PAUPERIS. DENIED 1) NO
APPLICATION FOR PAUPER AFFID ON FILE 2) APPEARS PROPER
JURISDICTION FOR MINOR CHILD, CHILD SUPPORT ARREARAGE
COMPLAINED ? IS TEH STATE OF
MINNESOTA********************************SWB**********SEE FILE".

8. **Declare the relevant co-tortfeasors in contumacy of the orders on the**
MOTION TO ENFORCE VISITATION AND GRANT PLAINTIFF ORDER
PERMITTING HIM TO SIGN FOR PASSPORT FOR HIS SON WITHOUT
THE DEFENDANT'S SIGNATURE

09-30-2003 CTFREE    -  6484937     Oct 1 2003 2:11:39:547PM -  $ 0.00

SO: DEF APPEARS BY ATTY. CARLYLE HATFIELD. PLAINTIFF
DOES NOT APPEAR. TERRY HATFIELD, FATHER OF DEF &
GRANDFATHER OF THE CHILD, APPEARS & TESTIFIES.
MOTION TO ENFORCE IS GRANTED SUBJECT TO THE
FOLLOWING(1) DEF SHALL PICKUP & RETURN CHILD AT
MOTHER'S RESIDENCE AT BEGINNING & END OF EACH
VISITATION, ALL AT DEF'S EXPENSE. (2) DEF SHALL POST
$10,000.00 CASH OR SURETY BOND WITH COURT CLERK TO
GUARANTEE RTURN OF THE CHILD AT CONSLUSION OF
EACH VISITATION PRIOR TO TAKING CHILD OUT OF UNITED
STATES. SURETIES MUST BE APPROVED BY THE COURT
CLERK*JUDGE GARY SNOW*

---

10-02-2003 CTFREE    -  6487741     Oct 2 2003 4:09:20:403PM -  $ 0.00

SO: RE: SUMMARY ORDER DATED 9-30-03, THE $10,000.00
BOND SHALL BE POSTED AND REMAIN POSTED UNTIL THE
CHILD ATTAINS AGE 18, TO GUARANTEE RETURN OF CHILD
FOR ANY VISITATION OUTSIDE U.S.A.. BOND IS NOT
REQUIRED FOR VISITATION WITHIN THE U.S.A.*JUDGE
GARY SNOW*

**having unlawfully refused aid to obtain, and retained passport for the
child.**

9. **Declare the island of Formosa, 22 CFR 51.1, "within the USA" so bond
was ever due for the visitation on Formosa.**

10.  **Declare that an impartial trial by jury de medietate linguae is granted,
composed half of Choctaw and Formosan Indians in the venire and in
the actual jury array.**

11. Declare that the US owe in quantum meruit the consulting services

rendered in the Tuvalu Taiwan Confederation project, and for Petitioner's work in mooting oral argument in Kiyemba I before the Supreme Court of the United States, and determine the fair fees due therefor, not less than US$1 million, altogether, and order the US to pay the same.

12. Declare and enjoin Petitioner's passport free of any CLASS hit restraints to liberty against expatriation on Formosa to obtain residence as a Japanese domicile/denizen.

13. Declare 21 O.S. 852A and **Minnesota Statutes 609.375,** unconstitutional on its face and as applied in the amended information, http://www.oscn.net/applications/oscn/GetCaseInformation.asp?submitted=true&viewtype=caseGeneral&casemasterID=348723&db=Cleveland, in **No. CF-2006-174, as violating the due process rights secured to Indians not taxed under the fourteenth amendment and the fourth amendment.**

Respectfully submitted,

Dr. Paul Maas Risenhoover, J.D.
Tainan, allied American Formosa trust territory island of Taiwan, West Pacific, USA
drpaulmaas@gmail.com, ilovelibby@gmail.com

Verification and Authentication, 28 USC 1746(2)
"I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)"

CERTIFICATE OF SERVICE
This is to certify that on the 4th day of May, 2012, a true and correct copy of the above and foregoing Motion to Quash and Suppress was delivered by the undersigned to the Cleveland County District Attorney's Office, Norman, Oklahoma, and the Court and Chambers, all via email:
cleveland@okdist21.org, allent@**okdist21.org** ,  creedh@**okdist21.org, rhonda**.hall@**oscn**.net, stephen.**bonner@oscn**.net, jonesk@okdist21.org, <jrisenhoover2@yahoo.com>, <steveamy@texomapeanut.com>, wvelie@velieandvelie.com, <will@velie.us>, <roncars1@aol.com>, <carlylehatfield@gmail.com>, cleveland@okdist21.org, allent@okdist21.org, creedh@okdist21.org, rhonda.hall@oscn.net, stephen.bonner@oscn.net, jonesk@okdist21.org, <dndrisenhoover@yahoo.com>, Terry Risenhoover

<therisenhoovers@gmail.com>, Ynyale@aol.com, R P ilovelibby@gmail.com,
<ecfhelpdesk@mnd.uscourts.gov>, greg.brooker@usdoj.gov,
darcie.boschee@usdoj.gov, usamn.ecfeighth@usdoj.gov,
bernetta.miller@usdoj.gov, childsupport@co.washington.mn.us,
kari.lindstrom@co.washington.mn.us, R P <ilovelibby@gmail.com>,
<Civil.Communications@usdoj.gov>, kohhh@state.gov,
<SupCtBriefs@usdoj.gov>, curtis.gannon@usdoj.gov,
michael.dreeben@usdoj.gov, douglas.letter@usdoj.gov.

By: _____

Dr. Paul Maas Risenhoover, J.D.

Executive Director and Rosh Yeshiva, Yeshiva Bnai Noah of the Bnai Noah
Religious Society, Robin Hood International Human Rights Legal Defense
Fund (http://www.scribd.com/ilovelibby)

Spiritual Adviser, Taiwan Civil Government movement,

Tainan, allied American Formosa trust territory island of Taiwan, West Pacific,
USA

drpaulmaas@gmail.com, ilovelibby@gmail.com

Appendix

(j) United States when used in a geographical sense means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and all other United States territories and possessions. (Corrected effective 2/1/2008; 73 FR 5435 )

Revisions to Passport Regulations; Correction [73 FR 5435] [FR 8-08]

DOCUMENT NUMBER: FR 8-08

FEDERAL REGISTER CITE: 73 FR 5435

DATE OF PUBLICATION: January 30, 2008

BILLING CODE 4710-06-P

DEPARTMENT OF STATE

22 CFR Part 51

RIN 1400-AC28

[Public Notice: 6084]

Revisions to Passport Regulations; Correction

AGENCY: Department of State.

ACTION: Final rule; correction.

SUMMARY: This document contains correction to the revised Passport rule published in the Federal Register on November 19, 2007 [Public Notice 5991].

DATE: Effective on February 1, 2008.

FOR FURTHER INFORMATION CONTACT: Consuelo Pachon, Office of Legal Affairs and Law Enforcement Liaison, Bureau of Consular Affairs, 2100 Pennsylvania Avenue, NW., Suite 3000, Washington, DC, telephone number

202-663-2431

Correction

    The final rule published on November 19, 2007 (72 FR 64930) is corrected as follows:

    1. In the SUPPLEMENTARY INFORMATION section, on page 64930, in the third column, final paragraph, the first sentence is corrected by removing the words "for first time passport applicants." The sentence as corrected reads "The passport application process is designed to verify the citizenship and identity of the applicant."

    2. On page 64932, 22 CFR 51.1(j) is corrected to read as follows:

"§ 51.1 Definitions.

* * * * *

    (j) United States when used in a geographical sense means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United

States, and all other United States territories and possessions.

* * * * *

    3. On page 64936, 22 CFR 51.51(e) is corrected to place quotes around the term "enhanced border security" and reads as follows:

  "§ 51.51 Passport fees.

* * * * *

    (e) An "enhanced border security" surcharge on the filing of each application for a regular passport in an amount set administratively by the Department and published in the Schedule of Fees for Consular Services.

* * * * *


January 24, 2008


Signed


Dated:


Ann Barrett,

Deputy Assistant Secretary, Bureau of Consular Affairs, Department of State.



Amended back from:

(j) United States when used in a
geographical sense means the
continental United States, Alaska,
Hawaii, Puerto Rico, Guam, and the
Virgin Islands of the United States.
http://regulations.justia.com/regulations/fedreg/2007/11/19/E7-22461.html


(l) U.S. national means a U.S. citizen
or a U.S. non-citizen national.
(m) U.S. non-citizen national means a
person on whom U.S. nationality, but
not U.S. citizenship, has been conferred
at birth under 8 U.S.C. 1408, or under
other law or treaty, and who has not
subsequently lost such non-citizen
nationality.

http://www.gpo.gov/fdsys/pkg/CFR-2006-title22-vol1/pdf/CFR-2006-title22-vol1-part 51.pdf

§ 51.1 Definitions.

The following definitions shall be applicable to this part:

(a)    United States    means the continental United States, the State of Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands of the United

States, the Canal Zone, American

Samoa, Guam and any other islands or territory over which the United States exercises jurisdiction.

Appendix II

Reasonable purge right

**VINSON v. STATE BARRON**

**Silvalane Shirley VINSON v. STATE of Alabama ex rel. Herman E. BARRON, Jr.**

**2970770.**

See State v. Burg, 648 N.W.2d 673, 680 (Minn. 2002) (implicitly accepting the district court's determination that mental incapacity was a lawful excuse and holding that the state had the burden of proof)[3];   [3] This was based upon the pre-2001 statute that included the phrase "without lawful excuse" within the paragraph defining the crime.   This element was subsequently moved to another subdivision, under the heading of affirmative defense.

State of Minnesota, Respondent, v. Daniel Dean Stewart, Appellant ...

law.justia.com › ... › December, 2004 - Cached
28 Dec 2004 – This **opinion** will be unpublished and ... Because the trial **court abused**its discretion in **refusing** to permit appellant to testify .... that **lawful excuse** exists for nonpayment of **child support**; that physical disability, incarceration, and

State of Minnesota, Respondent, v. Daniel Dean Stewart, Appellant. A03-2014, Court of Appeals Published, December 28, 2004.

This opinion will be unpublished and

may not be cited except as provided by

Minn. Stat. § 480A.08, subd. 3 (2002).

## STATE OF MINNESOTA
## IN COURT OF APPEALS
### A03-2014

The district court concluded that Clay County was a proper venue because the order for child support originated there.

We conclude that because the obligation to provide care and support to the child originated in Clay County, the case was properly venued in Clay County.   See Minn. Stat. § 627.01.

35

## A.        Lawful Excuse

Initially, the parties disagree over whether inability to pay is a lawful excuse.  The nonpayment-of-child-support statute does not provide a specific definition of lawful excuse.  The statute provides:

> It is an affirmative defense to criminal liability under this section if the defendant proves by a preponderance of the evidence that the omission and failure to provide care and support were with lawful excuse.

Minn. Stat. § 609.375, subd. 8 (2002).

Appellant, in arguing that inability to pay is a lawful excuse under Minnesota law, relies on State v. Townsend, 259 Minn. 522, 529, 108 N.W.2d 608, 613 (1960), where the court held that a defendant was not criminally liable for failing to pay support when that failure was due to an inability to pay and the defendant made a reasonable attempt to work and earn money.  In Townsend, a father had been recently released from prison, was working temporary jobs secured by the Minnesota State Employment Office, reported to the employment office almost daily, had no skills, and could only obtain common labor.  Id. at 528, 108 N.W.2d at 612.  The supreme court concluded that the "return of the defendant from a long prison term of several years, in part accounting for a derelict existence; his inability at the time in question to obtain regular or steady work; and his physical disability are all conditions which might be shown to overcome alleged intent or willfulness," which was required by the 1960 statute.  Id. at 529, 108 N.W.2d at 613.

Respondent argues that the ruling in Townsend is distinguishable because it was based on an antiquated statute and appellant did not prove that he made a reasonable attempt to find employment.  Further, respondent argues that inability to pay is not one of those limited situations where the courts have determined that lawful excuse exists for nonpayment of child support; that physical disability, incarceration, and mental incapacity must be shown.  See State v. Burg, 648 N.W.2d 673, 680 (Minn. 2002) (implicitly accepting the district court's determination that mental incapacity was a lawful

36

excuse and holding that the state had the burden of proof)[3]; State v. Wood, 168 Minn. 34, 38, 209 N.W. 529, 530-31 (1926) (holding that incarceration, without additional facts, was not sufficient to prove lawful excuse, as appellant may not have exhausted prior income, and still may have had the ability to pay support to his children); State v. Garrison, 129 Minn. 389, 391, 152 N.W. 762, 763 (1915) (stating that medical illness was a lawful excuse).

We cannot limit the concept of lawful excuse as stringently as respondent would seem to suggest, however.  Neither the courts nor the legislature have clearly defined "lawful excuse."  Though the courts have recognized this concept in a number of situations, they clearly have not limited its application to only those situations that have specifically been addressed.  We conclude that a case-by-case analysis is proper.

Appellant's next argument is similar to that which he makes regarding presentation of an affirmative defense of lawful excuse.  He testified in his own behalf at trial, and wished to explain his intent and motivation for nonpayment of child support; he had been involved in a vehicle accident that resulted in a death, and that such a record severely limited his ability to be gainfully employed as a truck driver.  He urges that the trial court's refusal to allow him to explain these matters to the jury deprived him of his constitutional right to testify on his own behalf.  He also argues that respondent opened the door for the testimony appellant seeks to present by arguing that he was voluntarily underemployed.  He alleges that he was entitled to rebut this argument of respondent with his own testimony.  See Morissette v. United States, 342 U.S. 246, 274, 72 S. Ct. 240, 255 (1952) (holding that the existence of criminal intent is a question of fact, which must be submitted to a jury).

There is merit in appellant's argument.  If a trial court's evidentiary ruling is determined to be erroneous, and the error reaches the level of a constitutional error, such as denying the defendant the right to present a defense, the standard of review is whether the exclusion of evidence was harmless beyond a reasonable doubt.  State v. Richardson, 670 N.W.2d 267, 277 (Minn. 2003).  The error cannot be said to be harmless beyond a

reasonable doubt, and therefore reversible, where there is a reasonable possibility that the error complained of may have contributed to the conviction.   Id.

The U.S. Supreme Court has held that a criminal defendant has a constitutional right to testify in his or her own behalf.   Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704, 2708 (1987).   Even though this right is limited by rules of evidence, courts have concluded that "the defendant's constitutional right to give testimony regarding his intent and motivation is very broad."   State v. Buchanan, 431 N.W.2d 542, 550 (Minn. 1988).   And this court has found that criminal defendants have a due-process right to explain their conduct to the jury, "whether or not their motives constitute a valid defense."   State v. Rein, 477 N.W.2d 716, 719 (Minn. App. 1991), review denied (Minn. Jan. 30, 1992).

We conclude that the district court committed error in precluding appellant from testifying on his own behalf.   And the trial court's error cannot be said to be harmless beyond a reasonable doubt.   Therefore, a new trial is required.[5]

（寄件人）郵遞
區號 70164

地址 27-1 Yu Nung Rd 513.54F/1-2, East Dist.
TAIWAN, Island of TAIWAN

姓名 Dr Paul Maas Risenheaver, Prose

電話 011-886-983103160
0983103160

**RECEIVED**
MAY 1 6 2012
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

**PAR AVION**
704026



**R** RA 512 66074 1 TW

（收件人）郵遞
區號 55101  USA 美國

地址 US Dist Court 316 N. Robert St.
100 Federal Bldg., S. Paul, MN

姓名 Rich Sletten, Clerk for Prose Civil Clerk

電話

X-RAYED
BY USMS

請書寫收、寄件人詳細地址，凡有價值或
重要之郵件，均應作為報值或保價交寄。